IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Ricky L. Wright,                            :
                Plaintiff          :          Civil Action 2:10-cv-00865

      v.                                 :          Judge Watson

Michael J. Astrue,                          :          Magistrate Judge Abel
Commissioner of Social Security,
                Defendant           :

**REPORT AND RECOMMENDATION**

Plaintiff Ricky L. Wright brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**<u>Summary of Issues.</u>**

Plaintiff Ricky Wright maintains he became disabled at age 45 by obesity, cardiomyopathy, coronary artery disease, and musculoskeletal impairments. The administrative law judge found that Wright retained the ability to perform a reduced range of jobs having light exertional demands.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to provide evidence concerning plaintiff's musculoskeletal impairment to the medical expert; and

- The administrative law judge incorrectly cited SSR 02-1p when discussing the effects of the plaintiff's obesity and failed to properly assess the

severity of plaintiff's impairments due to the combination of the his obesity, cardiac and musculoskeletal impairments.

**Procedural History.**  Plaintiff Ricky Wright filed his application for disability insurance benefits on October 13, 2004, alleging that he became disabled on September 27, 2004, at age 45, based on his heart condition.  (R. 56, 68.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On December 7, 2007, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 355.)  A vocational expert and a medical advisor  also testified.  On August 29, 2008, the administrative law judge issued a decision finding that Wright was not disabled within the meaning of the Act.  (R. 31.)  On July 30, 2010, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 4-6.)

**Age, Education, and Work Experience.**  Wright was born January 29, 1959.  (R. 56.) Wright completed the 11th grade.  (R. 73.)  He has worked as a restaurant manager. He last worked September 2004.  (R. 69.)

**Plaintiff's Testimony.** Plaintiff testified that he was 5'10' and weighed 350 pounds. His weight fluctuated between 340 and 350 pounds. He has been married since 1978, and his wife is employed at Kentucky Fried Chicken. Although she received health insurance benefits through her employer, plaintiff was not covered through her

2

plan because of the expense. Wright and his wife live with their daughter and son-in-law and their three children. (R. 361-62 and 368-69.)

Wright had been receiving services from State Bureau of Vocational Rehabilitation for the past year. Attempts to find him a job have been unsuccessful. Wright was offered a job with BVR assisting their clients, but he was unable to perform the job duties because it involved working outside in the sun. (R. 364-65.)

Plaintiff was last employed with Kentucky Fried Chicken. Wright testified that working became too difficult for him based on his congestive heart failure, depression, and anxiety. He had been at work, and he felt as though he was having a heart attack. (R. 365-67.) He left work and went to the hospital where he received a stent. He continued to have chest pain, although some of the "real hard squeezing" diminished. He continued to experience dizziness, chest pains, and feelings that he was having a heart attack. He also received a pacemaker and defibrillator. (R. 367-68.)

Wright also testified that his left leg prevents him form working. He broke his leg sometime in the 1980s, and it never fully recovered. His leg bothered him more as he aged. (R. 369.) He had been using a cane on and off for the last ten years. It was prescribed "at least" ten years ago. (R. 373.) He has not received treatment for his leg recently because he does not have health insurance. He has not had health insurance since he was last employed. He has received treatment for his heart through a charity program at Marietta Memorial Hospital. (R. 369-70.)

3

Wright also testified that his right leg and ankle had been broken in the 1980s, and it never healed properly. When he was working he took about 15 to 20 Tylenol pills a day to manage the pain, but he stopped when his doctor told him that that would kill him. (R. 370.)

For over a year before the hearing, Wright had been receiving treatment for depression and anxiety at a mental health clinic from a case manager and psychiatrist. He was seen once or twice a month for counseling and medication management. (R. 370-72.)

Plaintiff further testified that he was going to receive another heart catheterization that week. He was seen by his cardiologist every six months. He had monthly appointments with his family physician because he was prescribed Coumadin and required monthly blood draws. He was also treated for high blood pressure. Wright testified that he had been using a cane on and off for the last ten years. It was prescribed "at least" ten years ago. (R. 377-79.)

Wright testified that he performed some cooking and could occasionally shop for groceries. He washed the dishes. He socialized with friends or relatives who visited him approximately every two weeks. He used to hunt and fish, but he was no longer able to. He did not exercise, work in the yard or garden, or vacation. He drank alcohol only once in a great while, although he used to be a heavy drinker. He stopped smoking about ten years ago.  On a typical day, he woke up at ten o'clock. He sat around the house and watched television or his granddaughters. His son also stayed home to

4

watch the children. He usually napped during the day. He has difficulty sleeping at night because of sleep apnea. The machine does not help him as much as it used to. Side effects from his medications included stomach cramps and diarrhea. (R. 379-82.)

Wright testified that he could walk about 150 steps at a normal pace for two or three minutes before becoming tired. If he walked at a slower pace, he could walk for up to five minutes. At that point, he would begin to experience severe chest pains, dizziness, and difficulty breathing. He could stand for about 30 minutes. If he sits for too long, his hips begin to hurt. He could only sit for 30-40 minutes. He could lift about 30 pounds, but he could not carry that much weight. He had difficulty being around people and he becomes very nervous. He has a hard time concentrating. He felt bad and had had suicidal thoughts.  He has been on medication for his mental impairments for about five years. (R. 383-86.)

Upon questioning from his attorney, Wright testified that he could go up about 16 steps if he had a handrail. When he reached the top of the stairs in his house, he would be out of breath and have chest pains. When he experiences chest pains after walking, his recovery depends on the temperature. When it is hot, he cannot go nearly as far. His ankle does not bend as it should, which causes him to have to walk on his tiptoes. Going downhill is easier on his left leg, but it is harder on his right knee.  (R. 386-88.)

**Medical Evidence of Record.** The administrative law judge's decision fairly sets out the relevant medical evidence of record. This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

Marietta Memorial Hospital. On September 28, 2004, Wright was admitted to the hospital with atrial fibrillation with rapid ventricular response, chest pain, and dizziness with presyncopal episodes. Because plaintiff's heart rate could not be controlled with conventional measures he was transferred to Riverside Methodist Hospital. (R. 123.)

On September 29, 2004, plaintiff underwent a left heart catheterization and angiography. He was diagnosed with cardiomyopathy and coronary artery disease. (R. 107-08.) The catheterization revealed global hypokinesis, dilated cardiomyopathy with ejection fraction of 35%, RCA ostial lesion of 50%, and a small branch 60% stenosis. (R. 123.)

A September 27, 2004 x-ray of plaintiff's chest revealed unchanged borderline cardiomegaly when compared to a April 7, 2004 x-ray. (R. 132.)

On November 4, 2004, plaintiff presented at the emergency room after developing a muscular spasm in his right chest. It was believed that his pacemaker required adjustment, and he was scheduled to see a doctor the following day. (R. 157-58.)

6

On December 10, 2004, Wright presented at the emergency room with complaints of increasing shortness of breath on exertion that he first experienced a week before while walking across a field deer hunting. On examination, it was determined that plaintiff's pacemaker was malfunctioning. He was transferred to Ohio State University Hospital for interrogation of his pacemaker. (R. 154-56.)

On February 3, 2005, plaintiff was admitted to the hospital for chest pain and acute bacterial bronchitis. (R. 290-94.)

On July 7, 2005, Wright was admitted to the hospital because of chest discomfort and shortness of breath on exertion. (R. 231-39.) On August 22, 2005, plaintiff presented at the emergency room with complaints of dizziness. (R. 240-43.) An August 22, 2005 chest x-ray revealed mild cardiomegaly. (R. 244.)

On September 8, 2005, plaintiff presented at the emergency room with complaints of neck pain. (R. 289.)

A September 27, 2005 x-ray of Wright's left foot showed no evidence of acute fracture or dislocation. (R. 348.)

On October 8, 2005, plaintiff was treated at the emergency room for blood in his urine. (R. 286-88.) On October 9, 2005, plaintiff was treated at the hospital following an all terrain vehicle accident. (R. 245-61.) An October 9, 2005 x-ray of plaintiff's right knee show no fracture, dislocation, or significant degenerative change. (R. 257.) Wright's cervical spine exhibited no significant abnormality. (R. 260.) A CT scan of the abdomen and pelvis was unremarkable. (R. 261.)

On December 14-15, 2005, plaintiff underwent a functional capacity evaluation by a physical therapist employed by Isernhagen Work Systems, Marietta Memorial Hospital. (R. 193-200.) During the testing, Wright was frequently short of breath, but his oxygen saturation remained at 98-100%. Although the physical therapist said that Wright could move some light weights, she concluded his functional capacity was for sedentary work. She also noted that he was "limited in walking, standing and carrying tasks [so] that finding a job match will be a challenge." (R. 195.)

On February 5, 2006, plaintiff presented at the emergency room seeking to have his pacemaker checked after falling on his chest. There was no evidence of damage to the pacemaker or defibrillator. Wright had a mild chest wall contusion. (R. 283-85.)

On May 2, 2006, plaintiff presented at the emergency room with complaints of chest pain. (R. 280-81.) On May 31, 2006, Wright had a cardiac catheterization. (R. 262-63.)

On February 5, 2007, plaintiff was admitted to the hospital for chest discomfort believed to be brought on by stress. (R. 267-75.) A February 6, 2007 echocardiogram revealed a moderately dilated left ventricle with mild to moderate global hypokinesis. Ejection fraction was 40%. There mild mitral insufficiency and mild left atrial dilation. (R. 273-74.)

On June 27, 2007, plaintiff presented at the emergency room with complaints of chest pain and left leg pain. (R. 276-77.) Three days later he presented at the emergency room with extensive erythema and swelling over the left lower extremity. The limb had

8

previously been severely injured in the past with recurrent osteomyelitis and recurrent comminuted open fracture requiring surgical intervention and plastic surgery. (R. 295-305.) On September 10, 2007, plaintiff was admitted to the hospital for treatment of a possible cyst on the left axillary region. (R. 309-19.) On September 12, 2007, plaintiff underwent incision and drainage of left axillary abscess. (R. 307-08.)

Riverside Methodist Hospital. On October 3, 2004, plaintiff was admitted to the hospital. He underwent a successful ablation and placement of a biventricular pacemaker and defibrillator. On discharge, he was diagnosed with congestive heart failure, atrial fibrillation, primary cardiomyopathy, mitral valve disorder, and status post biventricular AICD deployment. (R. 137-38.)

Bob-Paul Erdelyi, M.D. On April 14, 2004, Dr. Erdelyi, plaintiff's primary care physician, examined plaintiff following discharge from the hospital. Plaintiff had been hospitalized for fibrilliation with rapid ventricular response, chest pain, and palpitations. Plaintiff was attempting to decrease his caloric intake. He had no paroxysmal nocturnal dyspnea or orthopnea. His heart rate was of regular rate and rhythm. (R. 211.) On April 20, 2004, plaintiff reported he was doing much better. He had had only a few episodes of palpitations and no shortness of breath. *Id.* In March 2004, plaintiff reported that he continued to do well. He had had only two episodes of chest pain in the past month. (R. 210.) In June, plaintiff reported that he had no chest pain, palpations, shortness of breath, or easy fatigability. He had been able to push his lawn mower, and he was active at work. (R. 209.)

9

On October 13, 2004, Dr. Erdelyi examined plaintiff following AICD placement and pacemaker insertion. Plaintiff had been doing well since discharge from the hospital. His energy levels had increased significantly, although he still tired easily after walking about half a block. He was diagnosed with atrial fibrillation and dilated cardiomyopathy. His ejection fraction of 30% was the result of alcoholism. (R. 208.) On November 15, 2004, plaintiff presented with complaints of a recent episode of dyspnea and chest discomfort while out hunting. Walking on uneven terrain made him short of breath and caused transient chest discomfort. Dr. Erdelyi recommended that plaintiff rest frequently and not engage in any strenuous physical activity. (R. 207.)

In a December 14, 2004 letter, Dr. Erdelyi informed plaintiff's employer that based on complications with his pacemaker Wright could no longer work in hot, steamy environments and could not return to his job as a fast food store manager. (R. 159.)

On December 22, 2004, Wright presented for follow up care following hospitalization for pacemaker revision and reinsertion the electrodes after they were dislodged. He had not noticed any palpitations. His heart rates was mostly in the 70s. He had no chest pain. (R. 205.)

On January 19, 2005, plaintiff presented with complaints of sadness, anxiety, and despair following his brother's suicide. He had had depression in the past and was prescribed Celexa 20 mg daily. He reported occasional chest pains which occur with exertion and were relieved with rest. He was prescribed Xanax for anxiety. (R. 204.) On

February 10, 2005, plaintiff was seen to evaluate his grief reaction. *Id.* On March 31, 2005, plaintiff was seen for complaints of abdominal pain. (R. 203.)

On May 9, 2005, Dr. Erdelyi noted that plaintiff was able to perform his activities of daily living as usual. Wright denied having any palpitations or deep-seated chest pain except when walking long distances. His wife reported that plaintiff had been irritable. Plaintiff had low self-esteem and frequent sadness. Dr. Erdelyi diagnosed generalized anxiety disorder. (R. 203.)

On August 1, 2005, Wright complained of pain radiating into his shoulders. His wife reported episodes where he stopped breathing for 30-40 seconds in the middle of the night. He felt tired most mornings. He reported intermittent depressive symptoms and anxiety. Dr. Erdelyi recommended an MRI of the spine if the pain did not improve within a week. He also referred Wright for a sleep study. His coronary artery disease and congestive heart failure were stable. (R. 202.)

On September 27, 2005, Wright reported that he felt fairly well and that he was able to perform most of his activities as ususal. He was mostly limited by his hip. He denied shortness of breath, paroxysmal dyspnea or orthopnea. He occasionally had chest pain, but it was relieved by rest. He had not required the use of sublingual nitroglycerin for more than two months. (R. 347.)

On February 9, 2006, plaintiff reported no chest pains except when doing strenuous exertion such as replacing the flooring in his brother's bathroom. He took a

nitroglycerin, and the pain resolved. (R. 346.) On May 9, 2006, plaintiff reported he had had to use nitroglycerin on two occasions. (R. 345.)

On June 26, 2006, plaintiff telephoned his doctor's office and stated he was ready to put a bullet through his head because of his inability to pay for his healthcare and his difficulties with the Social Security Administration. It was around the one-year anniversary of his brother committing suicide. Wright was referred to for evaluation for inpatient psychiatric care. (R. 344.)

That same day plaintiff presented at the emergency room with complaints of depression and suicidal ideation. (R. 264-66.) He reported that he had worked his entire life, but he could not work any longer because of his cardiac condition. He was discouraged that he had been denied Social Security disability benefits. He was diagnosed with major depressive disorder, recurrent versus single protracted episode, moderate to severe.

On June 29, 2006, plaintiff reported using about one nitroglycerin a day. He reported that his main problem is his left leg, where he had had multiple fractures, an infection of osteomyelitis requiring a skin graft. He did not have difficulty ambulating except when limited by pain. He had no postural instability. (R. 341.)  X-rays of plaintiff's left knee, ankle and foot revealed no evidence of fracture, dislocation, or other bony abnormality. (R. 342-43.) On July 17, 2006, Dr. Erdelyi stated he believed plaintiff had Morton's neuroma. He recommended an MRI and a referral to an orthopedic surgeon. (R. 340.)

On August 9, 2006, Dr. Erdelyi stated that a CT scan of plaintiff's foot failed to reveal any acute abnormalities other than chronic changes and osteoarthritis. Plaintiff reported daily foot pain particularly with ambulation. He also had occasional chest pain with ambulation. (R. 340.)

On October 10, 2006, plaintiff was seen one week after sustaining a burn injury from a blow torch. (R. 336.)

On December 7, 2006, plaintiff reported that he had recently been able to go hunting and walked the hills without great difficulty. (R. 335.) On February 21, 2007, plaintiff reported he had been doing quite well, with no palpitations or chest pains. He had developed a rash at the same time he performed some woodworking and furniture building for his family members.  On April 9, 2007, plaintiff reported he had been feeling except for pain in his left hand that occurred when manipulating objects and particularly when having to lift heavier objects.

On July 23, 2007, Wright complained of memory loss and headaches. Dr. Erdelyi assessed dementia and new onset headaches. He referred plaintiff for a MRI. (R. 330.) A head CT showed no evidence of hydrocephalus, acute intracranial hemorrhage or enhancing mass lesion. (R. 329.) A carotid doppler showed mild atherosclerotic changes. Stenoses appeared to be 40% or less bilaterally. (R. 328.)

On August 30, 2007, plaintiff reported that he was feeling better. His headaches had improved. He had no chest pain, palpitations, paroxysmal nocturnal dyspnea or orthopnea. (R. 327.)

13

<u>MidOhio Cardiology and Vascular Consultants</u>. On October 4, 2004, Ralph S. Augostini, M.D. examined plaintiff in the cardiac electrophysiology laboratory at Riverside Methodist Hospital. He noted plaintiff had a history of alcoholic cardiomyopathy with recent clinical deterioration associated atrial fibrillation.  Despite multiple drugs, he had had recurrent presentation with atrial fibrillation associated with rapid ventricular response and decompensated failure. He underwent implantation of a  biventricular pacemaker/ICD with AV node junction ablation. (R. 163-64.) In a December 15, 2004 letter to Dr. Edelyi, Dr. Augostini indicated that plaintiff underwent successful ICD lead revision. (R. 161-62.)

On May 24, 2006, Wright reported having increasing trouble with chest discomfort and shortness of breath. He was increasingly fatigued and had some peripheral edema. A cardiac catheterization was scheduled. (R. 224.)

On June 7, 2006, Dr. Goulder noted that plaintiff recently underwent a cardiac catheterization because he had been experiencing increasing trouble with chest discomfort and congestive failure. His catheterization showed a mild disease in the right coronary and left circumflex artery. There was a 75% lesion in the midportion of the left anterior descending artery. His LV systolic function demonstrated global hypokinesis with an overall ejection fraction of 25%. It was recommended that plaintiff undergo a PET scan to determine the necessity of balloon angioplasty and stenting of the left anterior descending artery. (R. 223.) On June 12, 2006, plaintiff underwent a dipyridamole stress gated pet rubidium (Rb82) myocardial perfusion study. There was

14

evidence of mild inducible ischemia in the apical region. Global left ventricular systolic function was mildly to moderately reduced. (R. 222.)

On June 21, 2006, John F. Tugaoen, M.D. reported that he had performed a successful angioplasty and stenting involving the proximal LAD. The left main trunk and circumflex system were patent with severe LV dysfunction and an ejection fraction of 25%. Plaintiff's right coronary artery was mildly diseased and non-dominant. Base on these findings, his prognosis was superb. (R. 221.)

On August 9, 2006, Wright reported stinging and sharp chest pains, but it did not sound cardiac in nature. On February 15, 2007, Dr. Goulder stated that plaintiff continued to do nicely. He had not had any chest pain, shortness of breath, peripheral edema, paroxysmal nocturnal dyspnea, or orthopnea. Dr. Goulder noted that Wright had an ejection fraction in the range of 25% and had developed a 75-80% stenosis in the left anterior descending artery. Plaintiff was scheduled to undergo sleep apnea testing. (R. 220.)

On August 31, 2007, Dr. Goulder noted that plaintiff's blood pressure and heart rate were doing reasonably well. He noted that plaintiff had recently been hospitalized for congestive heart failure, but he was doing better. He was not having any chest discomfort or shortness of breath. (R. 218.)

On September 10, 2007, plaintiff underwent a adenosine stress gated spect sestamibi myocardial perfusion study. Wright did not develop any symptoms during adenosine infusion, and the hemodynamic response was normal. The ECG response to

adenosine was nondiagnostic for ischemia due to paced rhythm. On post-stress images, the heart was enlarged, and there was a mild perfusion defect in the inferoapical and the distal inferolateral regions of the left ventricle. There was evidence of localized, mild infarction in the inferoacpical and distal inferolateral regions. Global left ventriuclar systolic function was mildly reduced. (R. 217.)

Esberdado Villanueva, M.D. On January 13, 2005. Dr. Villanueva completed a physical residual functional capacity evaluation for the Bureau of Disability Determination. (R. 166-73.) Dr. Villanueva concluded that plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He could stand and/or walk for at least two hours in an 8-hour workday. He could sit about six hours in an 8-hour workday. His ability to push and/or pull was not limited. Dr. Villanueva noted that on December 22, 2004, plaintiff reported feeling much better. His lungs were clear, and his heart was of regular rate and rhythm. No chest pain was reported. (R. 168.) Although he could occasionally climb ramps or stairs, he could never climb ladders, ropes, or scaffolding.

Dr. Villanueva concluded that plaintiff was generally credible, although his reports regarding functioning were not entirely consistent. This was not unexpected given the acute episodes he experienced. Dr. Villanueva noted that plaintiff continued to occasionally go hunting, driving, and shopping. (R. 171.)

On January 13, 2005, Robert E. Norris, M.D., reviewed the evidence of record and affirmed the assessment of Dr. Villanueva. (R. 173.)

16

**Psychological Impairments.**

Gary S. Sarver, Ph.D. On March 4, 2005, Dr. Sarver, a psychologist, evaluated

Wright for the Bureau of Disability Determination. (R. 174-78.) On mental status

examination, he reported that his appetite was good, but he had low energy. He had

difficulty falling and staying asleep. When asked if he was depressed, he responded,

"not really." (R. 175.) He reported low level suicidal ideation. He was angry at his

children five days a week. He did not cry. He denied having hallucinations or

delusions. He reported that he was unable to work because of his chest pain. His mood

was described as unremarkable with euthymic affect. (R. 176.) No emotional lability

was noted. He was oriented in all four spheres. His short and long-term memory was

intact. Dr. Sarver noted that Wright participated in day-to-day activities such as

shopping, bill paying, and managing the household. (R. 174.)

Dr. Sarver opined that Wright's ability to relate to others, including supervisors,

appeared to be mildly limited by his depression and anxiety. His ability to understand

and follow simple one and two-step instructions appeared to be minimally limited as he

appeared to be functioning within the low average range of intellectual ability. His

ability to maintain attention and perform simple, repetitive tasks appeared to be

minimally limited and there were no indications that he had difficulty with attention,

pace, or persistence. His ability manage daily work stresses appeared to be minimally

limited and he appeared to be functioning with adequately developed ego skills. He

had the ability to organize, structure, and work towards goals. He had the capacity to

contain his impulses, manage his frustration, and deal with anger appropriately. (R. 177-78.) Dr. Sarver diagnosed adjustment disorder with depression and anxiety. He assigned a Global Assessment of Functioning ("GAF") score of 65. (R. 178.)

Guy G. Melvin, Ph.D. On April 20, 2005, Dr. Melvin, a psychologist, reviewed the record and completed a psychiatric review technique for the Bureau of Disability Determination. On August 29, 2005, Caroline T. Lewin, Ph.D., reviewed the evidence of record and affirmed Dr. Melvin's assessment. (R. 179.) Dr. Melvin found that Wright had an adjustment disorder with depression and anxiety. He concluded that Wright had no restriction of daily activities. He had only mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. There were no episodes of decompensation. (R. 189.)

Dr. Melvin noted that plaintiff received his psychiatric medications through his primary care physician. He had had no psychiatric treatment or inpatient hospitalizations. There were no significant mental problems preventing him from working. (R. 191.)

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since September 27, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571, *et seq.*)

3.  The claimant has the following severe impairments: cardiomyopathy; coronary artery disease, improved; and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), but he can stand and walk, in combination, at least 2 hours, and sit for 6 hours during an 8-hour workday; should not climb ladders, ropes, or scaffolds, but may occasionally climb ramps and stairs; should not be exposed to hazards such as unprotected heights or dangerous moving machinery; should not be exposed to extremes of heat or cold; and should not perform more than frequent kneeling, crawling, crouching, or stooping.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565.)

7.  The claimant was born on January 29, 1959 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.     The claimant has not been under a disability, as defined in the
Social Security Act, from September 27, 2004 through the date of
this decision (20 CFR 404.1520(g)).

(R. 21-30.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

of the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389,

401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is

"'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976).  The Commissioner's findings of fact must be based upon the record as a whole.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner

denying benefits should be reversed because:

•       The administrative law judge failed to provide evidence concerning

        plaintiff's musculoskeletal impairment to the medical expert. At the

hearing, counsel for plaintiff pointed out that evidence concerning his musculoskeletal impairment was contained in a earlier Social Security file. The administrative law judge refused to consider that evidence because it was prior to his alleged onset date.

- <u>The administrative law judge incorrectly cited SSR 02-1p when discussing the effects of the plaintiff's obesity and failed to properly assess the severity of plaintiff's impairments due to the combination of the his obesity, cardiac and musculoskeletal impairments</u>. Plaintiff argues that the administrative law judge never considered plaintiff's obesity at step three of the sequential evaluation. Plaintiff maintains that the hearing transcript shows that the medical expert did not factor in his obesity when determining whether or not Wright met or equaled a listing.

**<u>Analysis.</u>**

<u>Plaintiff's musculoskeletal impairment</u>. The administrative law judge stated:

The claimant alleged hip and leg pain secondary to his history of lower extremity fracture in the 1980's. However, as confirmed by the medical expert, the record does not contain current objective or clinical evidence of significant degenerative changes in the lower extremities or hips and does not document the presence of an ongoing severe impairment. Treatment records are remarkable only for the claimant's subjective complaints and do not support a finding that the claimant has suffered from a lower extremity impairment that can be reasonably expected to reduce his functional capacity for any consecutive 12-month period since his alleged disability onset date of September 27, 2004.

(R. 22.) Plaintiff does not point to any evidence demonstrating that he had a severe musculoskeletal impairment. Rather, he relies on evidence from a prior Social Security

application. Plaintiff does not state what the earlier evidence stated or describe the evidence upon which he relies in any whatsoever. The administrative law judge cannot consider evidence that was not made part of the record. There is substantial evidence in the record supporting the administrative law judge's finding that the treatment records only contained plaintiff's subjective complaints concerning his alleged musculoskeletal impairment. The record does not contain any medical source opinion indicating that plaintiff's musculoskeletal impairments, alone or in combination with other impairments, prevent him from performing the work described in the administrative law judge's residual functional capacity findings.

Even though the administrative law judge concluded that plaintiff did not have a severe musculoskeletal impairment, he formulated a residual functional capacity assessment that accommodated any alleged limitation by limiting him to two hours of combined stand and walking in an 8-hour day.

Obesity. Plaintiff argues that the administrative law judge failed to consider the impact of his obesity on her ability to work as required by SSR 00-3p. The administrative law judge stated:

> The claimant is obese and medical records mention this diagnosis in the review of systems and medical history sections, but, again, there is no current objective or clinical evidence supporting the presence of this impairment or any related functional difficulty. Therefore, because there is no supporting objective or clinical findings in the record supporting a finding that either of these impairments causes more than minimal functional restrictions, they cannot be found to be severe within the meaning of the Social Security Act.

(R. 22.) The medical expert explicitly stated that when he considered the totality of the record and concluded that plaintiff could perform work at the light exertion level, he considered plaintiff's obesity. In fact, the medical expert testified that were he not obese Wright would be able to perform more strenuous work than light work. (R. 397-98.) The administrative law judge noted that plaintiff has "cardiomyopathy and coronary artery disease, the functional effects of which are aggravated by his obesity." (R. 27.) The administrative law judge also noted that he imposed postural restrictions based on plaintiff's obesity. *Id.* Furthermore, when an administrative law refers to a claimant's combined impairments, he has met his obligation to consider the claimant's impairments in combination.  *See, Loy v. Secretary of Health and Human Services,* 901 F.2d 1306, 1310 (6th Cir. 1990). Here, the administrative law judge adequately analyzed the limiting effects of plaintiff's obesity.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof

23

in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

                                         s/Mark R.  Abel
                                        United States Magistrate Judge